KJ:JD
F.#2005R02244

# M-06- 483

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------X

UNITED STATES OF AMERICA

   -against-

ERIC COHEN

       Defendant.

----------------------------X

TO BE FILED UNDER SEAL

AFFIDAVIT IN SUPPORT
OF AN ARREST WARRANT

(T. 50 U.S.C. §§ 1701-05;
T. 50 App. U.S.C. §§ 2401-
2420; T. 15 C.F.R. §§ 730-
774)

EASTERN DISTRICT OF NEW YORK, SS.:

     Robert Dugan, being duly sworn, deposes and says that he is a Special Agent of the Office of Export Enforcement, United States Department of Commerce ("Department of Commerce") duly appointed according to law and acting as such.

     Upon information and belief, on or about June 2005, within the Eastern District of New York and elsewhere, the defendant ERIC COHEN, together with others, did knowingly and willfully export seven FLIR FF-131 thermal imaging cameras from the United States to South Korea, without first obtaining the required export license from the United States Department of Commerce, in violation of Title 50, United States Code, Sections 1701 through 1705, Title 50, United States Appendix, Section 2410(a), and Title 15, Code of Federal Regulations, Section 764.2.

1

The source of your deponent's information and the grounds for his belief are as follows:

### INTRODUCTION

1.  I am a Special Agent assigned to the New York Field Office of the United States Department of Commerce, Bureau of Industry and Security, Office of Export Enforcement ("OEE").  I have been a Special Agent with OEE since August 2003.  From May 1996 through August 2003, I was employed as an Inspector with the United States Customs Service, which is now part of the Department of Homeland Security.  As a Special Agent with OEE, I am responsible for investigating, among other things, criminal violations of the Export Administration Act, 50 App. U.S.C. 2401-2420 (the "EAA") and the regulations promulgated thereunder, the Export Administration Regulations, 15 C.F.R. 730-774 (the "EAR").  Copies of the relevant statutes are attached hereto as Exhibit A.  Based upon my training and experience as an OEE Special Agent, I am familiar with the means by which individuals commit violations of the EAA and EAR.

2.  The facts set forth in this Affidavit are based in part on information that I have learned from the review of written documents prepared by and conversations with members of the OEE and other law enforcement agencies and the review of various documents obtained by subpoena.  Unless specifically

2

indicated, all conversations and statements described herein are related in substance and in part only. Because I submit this affidavit for the limited purposes of establishing probable cause to obtain an arrest warrant, I have not included details of every aspect of this investigation of which I am aware.

<u>THE EXPORT ADMINISTRATION ACT AND</u>
<u>THE EXPORT ADMINISTRATION REGULATIONS</u>

3. Congress enacted the EAA to codify the export control policy of the United States. Pursuant to the provisions of the EAA, the Department of Commerce has promulgated the EAR, which contain additional restrictions on the export of goods outside of the United States consistent with the policies and provisions of the EAA.

4. Although the EAA lapsed on August 17, 2001, pursuant to the authority provided by the President under the International Emergency Economic Powers Act, 50 U.S.C. 1701-1705 ("IEEPA"), the President issued Executive Order 13222. In that order, the President declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the EAA. Congress still has not renewed the EAA, but the President has renewed annually the Executive Order. For purposes of this Affidavit, the President signed the relevant renewals on August 6, 2004, 68 FR 48763, and August 2, 2005, 70 FR 45273. By virtue of the Executive Order 13222 and these

3

renewals, the provisions of the EAA and the EAR remain in effect.

5.   The EAA and IEEPA provide criminal penalties for certain violations of the EAR.   Specifically, Section 2410(a) of the EAA provides that "whoever knowingly violates or conspires to or attempts to violate any provision of [the EAR] or any regulation, order, or license therunder shall be fined not more than five times the value of the exports involved or $50,000, whichever is greater, or imprisoned not more than 5 years, or both."  50 App. U.S.C. 2410(a).  Section 764.2 of the EAR also provides criminal penalties for violations of its provisions.   15 C.F.R. 764.2.  Similarly, Section 1705(b) of IEEPA reads "whoever willfully violates, or willingly attempts to violate any license, order, or regulation issued under [IEEPA], be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than ten years, or both."  As a result, failure to comply with export restriction currently in effect as a result of the executive orders is a criminal violation of IEEPA.

PROBABLE CAUSE TO ARREST THE DEFENDANT ERIC COHEN

6.   On August 5, 2005, a project manager at FLIR Systems informed the Department of Commerce, New York Field Office that seven FLIR FF-131 lightweight thermal imaging cameras[1] may have been exported to South Korea without an export

---

[1] The FLIR FF-131 is a lightweight thermal imaging camera that is used as a navigational aid.  Specifically, the FF-131 is an infrared vision system that enhance's the user's ability to

license. FLIR Systems is one of the largest producers of thermal imaging cameras in the United States and has an extensive export licensing history for thermal imaging products with the Department of Commerce. According to FLIR, the company that may have exported these cameras was Ever Dixie USA EMS Supply ("Ever Dixie") located at 101-01 Foster Avenue, Brooklyn, New York 11236 (the "Ever Dixie Office").[2]

7. On June 3, 2005, nine FLIR FF-131 cameras were shipped from Aerion Technologies, the manufacturer of the FLIR camera, located in Dallas, Texas, to the Ever Dixie Office. The invoice for the cameras was sent to Tyler Fire Equipment ("Tyler"), which is located in Elmira, New York.

8. On October 27, 2005, I interviewed representatives of Tyler. The representatives of Tyler informed me that they received an order for nine FLIR FF-131 cameras from Ever Dixie, on May 20, 2005. A Tyler representative informed me that he/she specifically told the defendant ERIC COHEN, a sales representative for Ever Dixie, that the cameras could not be

---

see though smoke and darkness. It also allows the user to see thermal interpretations of objects that emit, reflect or conduct infrared energy. The detecting mechanism of the FF-131 is a device designed to detect and amplify sources in the infrared spectrum in extremely high temperature sources.

[2] Ever Dixie is affiliated with a group of other companies that operate out of the Ever Dixie Office, including without limitation Ever Ready First Aid Medical Supply Corporation and Dixie EMS Supply USA LLC.

exported from the United States without the required Department of Commerce export license.  According to a Tyler representative, the defendant claimed that the FLIR FF-131 cameras were for domestic sale to various fire departments located within New York State and as a result, no export license was necessary.  The defendant also indicated to the Tyler representative that at least one camera might be maintained by Ever Dixie as a showpiece.

9.   Tyler representatives have provided me with copies of all emails between Tyler and the defendant ERIC COHEN regarding the sale of the cameras.  During the email exchange, which took place between May 27, 2005 and June 2, 2005, the defendant informed representatives of Tyler that two cameras would be sold to the fire department for the Village of Kiryas Joel, New York, and seven cameras would be sold to the East Midwood Fire Department in Brooklyn, New York.

10.   On October 31, 2005, I telephonically interviewed an individual employed by the Village of Kiryas Joel Fire Department ("Witness-1") regarding the thermal imaging cameras. During that conversation, Witness-1 informed me that the department received two cameras, which were currently located at their facility in Monroe, New York.

6

11. On November 10, 2005, I traveled to Monroe, New York and interviewed Witness-1 in person at the Village of Kiryas Joel Fire Department. Witness-1 stated that he/she had made a mistake during the telephone interview and he/she informed me that the defendant ERIC COHEN had asked if COHEN could use the address of the Village of Kiryas Joel Fire Department to reflect a fictitious sale of the thermal imaging cameras, which cameras were actually sold to an undisclosed buyer. Witness-1 admitted that he/she allowed the defendant to use the fire department's address and further stated that at no time did the fire department order or receive the thermal imaging cameras from Ever Dixie.

12. On November 3, 2005, I interviewed a certain individual ("Witness-2"), whose name was provided to Tyler by the defendant ERIC COHEN in connection with the alleged sale of seven cameras by Ever Dixie to the East Midwood Fire Department. Witness-2 stated that he/she was not currently employed by the East Midwood Fire Department, but previously had been employed by the East Midwood Ambulance Corporation. Witness-2 stated that he/she never ordered or received any of the seven thermal imaging cameras. Additionally, Witness-2 acknowledged that he/she was friends with the defendant, but had no idea or knowledge as to why the defendant would list him/her as the recipient of the cameras.

7

13.  On November 2, 2005, I received a telephone call from Steven Goodman, Esq., an attorney with the law firm of Goodman & Sapperstein.  Mr. Goodman advised me that he had been retained as counsel for Ever Dixie.  During the conversation, Mr. Goodman confirmed that Ever Dixie had purchased nine FLIR FF-131 cameras from Tyler in June 2005.  Mr. Goodman confirmed that Ever Dixie told representatives of Tyler that the cameras were for domestic sale to fire departments in New York.  Mr. Goodman then revealed that after Ever Dixie received the FLIR FF-131 cameras, the company exported seven cameras to a South Korean company called Komeco Company Ltd. on approximately June 7, 2005.

14.  Mr. Goodman subsequently provided me with a copy of the airway bill for the export of the seven FLIR FF-131 cameras, which indicated that the cameras were exported to Komeco Company Ltd., located at 508-8 Taijeon-Dong, Gwangju City, Kyonggi-Do, South Korea.  The airway bill lists a declared value of $3,400.00 for all seven cameras.  This declared value on the airway bill significantly differs from the amount on the Aerion Technologies invoice, which lists the value of the cameras as $61,600.

15.  On December 20, 2005, I interviewed the defendant ERIC COHEN at his residence located at 2042 East 7th Street, Brooklyn, New York.  During the interview, the defendant was asked about his involvement with the export of the seven FLIR

8

FF-131 cameras.  The defendant responded that he was instructed by his superiors at Ever Dixie not to discuss the cameras and that I should contact the company's lawyer.  At that point, I terminated the interview of the defendant; however, before I left his residence, the defendant stated in sum and substance that Ever Dixie had shipped the cameras out of country to South Korea to a legitimate distributor.  Cohen continued that he and others involved knew the cameras were going to a legitimate end-user and did not do anything wrong.

16.  On December 20, 2005, members of OEE, New York Field Office and the United States Postal Inspection Service conducted a search warrant at the Ever Dixie Office.  During the execution of the search warrant, several computer hard drives were imaged, including the computer of the defendant ERIC COHEN. No FLIR FF-131 thermal imaging cameras were found at the SUBJECT PREMISES during the search.

17.  I have reviewed the evidence found on the defendant ERIC COHEN's computer, including numerous emails relating to the export of seven thermal imaging cameras to Komeco Company Ltd. in South Korea, which were sent and/or received between March 2005 and September 2005.  These emails were found in email folders labeled "Komeko" and "Sent Items."

9

APPLICATION OF THE EAR and EAA TO THE DEFENDANT

18.   Based on my training and experience, I am aware that the EAR contains licensing requirements for certain goods, technology and software that are exported outside of the United States.   The EAR requires a particular analysis to determine whether an export license is needed to send a particular product to a particular country.   15 C.F.R 736.2(b)(1)(I).   The EAR identifies the reasons for the restrictions for each commodity. The EAR Commerce Control List ("CCL"), 15 C.F.R. 774, Supp. I, identifies the commodities by an Export Control Classification Number ("ECCN").   Thermal imaging cameras of the type sold by Ever Dixie to Komeco Company Ltd. fall within the ambit of ECCN 6A003.b.4.   Items under this ECCN are restricted for reasons of regional stability and may not be exported without a license to countries listed in column "Regional Stability 1" of the Commerce Country Chart found in 15 C.F.R. 738, Supp.I.   South Korea is listed in that column and, as a result, Ever Dixie was required to have a license for this export.

19.   I have reviewed the Department of Commerce databases and have determined that there is no record of an export license for thermal imaging cameras or any other commodity for the defendant ERIC COHEN, Ever Dixie, or any of its respective affiliates or subsidiaries (see footnote 1, supra).

10

20.    Furthermore, Section 2410 of the EAA criminalizes violations of the EAR, which violations include the export of various commodities without proper licensing.  These violations are in addition to the prohibitions set out in Section 764.2 of the EAR, which include criminal, civil and administrative penalties.

21.    Further, I have reviewed all available export declarations filed with the United States Customs Service ("Customs") by Ever Dixie and its respective affiliates and subsidiaries, and did not locate a Shipper's Export Declaration ("SED")[3] for the shipment of the thermal imaging cameras to South Korea; even though the filing of a SED is required by the United States government for this particular export.  The EAR requires that any single commodity valued at $2,500 or more, which is exported from the United States to any destination except Canada, must be documented on a SED submitted to the United States government.  15 C.F.R. 758.1(b)(3).  Additionally, a SED must be filed anytime the exported product requires a Department of Commerce license; as is the case with the FLIR cameras.  15 C.F.R. 758.1(b)(2).  Finally, the value of the FLIR cameras was

---

[3] Among other things, a SED requires the exporter to list the country of ultimate destination, the date of exportation, the name and address of the recipient, the name and address of the person or entity exporting the items, a description of the exported items and the U.S. dollar value of the exported items. 15 C.F.R. 758.1(b)(2).

11

grossly undervalued on airway bill LAO3382, and no reference is made to the license requirement.

22. Based on the evidence set forth above, there is probable cause to believe that the defendant ERIC COHEN exported goods to South Korea, in violation of the provisions of the EAA, EAR and IEEPA.

WHEREFORE, your deponent requests that an arrest warrant be issued for the defendant ERIC COHEN so that he may be dealt with according to law.  If is further requested that this Affidavit and the arrest warrant be filed under seal.


SPECIAL AGENT ROBERT DUGAN
U.S. Department of Commerce
Office of Export Enforcement


Sworn to before me this
___ day of Mav. 2006

        RER
_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

**EXHIBIT A**

50 USCS § 1701

§ 1701.  Unusual and extraordinary threat; declaration of national emergency; exercise of Presidential authorities

(a) Any authority granted to the President by section 203 [50 USCS § 1702] may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

(b) The authorities granted to the President by section 203 [50 USCS § 1702] may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this title [50 USCS §§ 1701 et seq.] and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

50 USCS § 1702

§ 1702. Presidential authorities

(a) In general.

(1) At the times and to the extent specified in section 202 [50 USCS § 1701], the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise--

(A) investigate, regulate, or prohibit--

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and

(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

(2) In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

(3) Compliance with any regulation, instruction, or direction issued under this title [50 USCS §§ 1701 et seq.] shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this title, or any regulation, instruction, or direction issued

under this title.

(b) Exceptions to grant of authority. The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly--

(1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

(2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 202 of this title [50 USCS § 1701], (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; [or]

(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 5 of the Export Administration Act of 1979 [50 USCS Appx. § 2404], or under section 6 of such Act [50 USCS Appx. § 2405] to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of title 18, United States Code [18 USCS §§ 791 et seq.]; or

(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

(c) Classified information. In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act [18 USCS Appx § 1(a)]) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.

50 USCS § 1703

§ 1703.  Consultation and reports

(a) Consultation with Congress. The President, in every possible instance, shall consult with the Congress before exercising any of the authorities granted by this title [50 USCS §§ 1701 et seq.] and shall consult regularly with the Congress so long as such authorities are exercised.

(b) Report to Congress upon exercise of Presidential authorities. Whenever the President exercises any of the authorities granted by this title [50 USCS §§ 1701 et seq.], he shall immediately transmit to the Congress a report specifying--
    (1) the circumstances which necessitate such exercise of authority;
    (2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;
    (3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;
    (4) why the President believes such actions are necessary to deal with those circumstances; and
    (5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

(c) Periodic follow-up reports. At least once during each succeeding six-month period after transmitting a report pursuant to subsection (b) with respect to an exercise of authorities under this title [50 USCS §§ 1701 et seq.], the President shall report to the Congress with respect to the actions taken, since the last such report, in the exercise of such authorities, and with respect to any changes which have occurred concerning any information previously furnished pursuant to paragraphs (1) through (5) of subsection (b).

(d) Supplemental requirements. The requirements of this section are supplemental to those contained in title IV of the National Emergencies Act [50 USCS § 1641].

50 USCS § 1704

§ 1704.  Authority to issue regulations

The President may issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this title [50 USCS §§ 1701 et seq.].

50 USCS § 1705

§ 1705.  Penalties

(a) A civil penalty of not to exceed $ 50,000 may be imposed on any person who violates, or attempts to violate, any license, order, or regulation issued under this title [50 USCS §§ 1701 et seq.].

(b) Whoever willfully violates, or willfully attempts to violate, any license, order, or regulation issued under this title [50 USCS §§ 1701 et seq.] shall, upon conviction, be fined not more than $ 50,000, or, if a natural person, may be imprisoned for not more than twenty years, or both; and any officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both.

50 USCS Appx § 2410

§ 2410.  Violations

(a) In general. Except as provided in subsection (b) of this section, whoever knowingly violates or conspires to or attempts to violate any provision of this Act or any regulation, order, or license issued thereunder shall be fined not more than five times the value of the exports involved or $ 50,000, whichever is greater, or imprisoned not more than 5 years, or both.

(b) Willful violations.
  (1) Whoever willfully violates or conspires to or attempts to violate any provision of this Act or any regulation, order, or license issued thereunder, with knowledge that the exports involved will be used for the benefit, or that the destination or intended destination of the goods or technology involved is, any controlled country or any country to which exports are controlled for national security or foreign policy purposes--
    (A) except in the case of an individual, shall be fined not more than five times the value of the exports involved or $ 1,000,000, whichever is greater; and
    (B) in the case of an individual, shall be fined not more than $ 250,000, or imprisoned not more than 10 years, or both.
  (2) Any person who is issued a validated license under this Act for the export of any good or technology to a controlled country and who, with knowledge that such a good or technology is being used by such controlled country for military or intelligence gathering purposes contrary to the conditions under which the license was issued, willfully fails to report such use to the Secretary of Defense--
    (A) except in the case of an individual, shall be fined not more than five times the value of the exports involved or $ 1,000,000, whichever is greater; and
    (B) in the case of an individual, shall be fined not more than $ 250,000, or imprisoned not more than 5 years, or both.
  (3) Any person who possesses any goods or technology--
    (A) with the intent to export such goods or technology in violation of an export control imposed under section 5 or 6 of this Act [50 USCS Appx §§ 2404, 2405] or any regulation, order, or license issued with respect to such control, or
    (B) knowing or having reason to believe that the goods or technology would be so exported,
  shall, in the case of a violation of an export control imposed under section 5 [50 USCS Appx § 2404] (or any regulation, order, or license issued with respect to such control), be subject to the penalties set forth in paragraph (1) of this subsection and shall, in the case of a violation of an export control imposed under section 6 [50 USCS Appx § 2405] (or any regulation, order, or license issued with respect to such control), be subject to the penalties set forth in subsection (a).
  (4) Any person who takes any action with the intent to evade the provisions of this Act or any regulation, order, or license issued under this Act shall be subject to the penalties set forth in subsection (a), except that in the case of an evasion of an export control imposed under section 5 or 6 of this Act [50 USCS Appx §§ 2404, 2405] (or any regulation, order, or license issued with respect to such control), such person shall be subject to the penalties set forth in paragraph (1) of this subsection.
  (5) Nothing in this subsection or subsection (a) shall limit the power of the Secretary to define

by regulations violations under this Act.

(c) Civil penalties; administrative sanctions.

(1) The Secretary (and officers and employees of the Department of Commerce specifically designated by the Secretary) may impose a civil penalty not to exceed $ 10,000 for each violation of this Act or any regulation, order, or license issued under this Act, either in addition to or in lieu of any other liability or penalty which may be imposed, except that the civil penalty for each such violation involving national security controls imposed under section 5 of this Act [50 USCS Appx. § 2404] or controls imposed on the export of defense articles and defense services under section 38 of the Arms Export Control Act [22 USCS § 2778] may not exceed $ 100,000.[.]

(2) (A) The authority under this Act to suspend or revoke the authority of any United States person to export goods or technology may be used with respect to any violation of the regulations issued pursuant to section 8(a) of this Act [50 USCS Appx. § 2407(a)].

(B) Any administrative sanction (including any civil penalty or any suspension or revocation of authority to export) imposed under this Act for a violation of the regulations issued pursuant to section 8(a) of this Act [50 USCS Appx. § 2407(a)] may be imposed only after notice and opportunity for an agency hearing on the record in accordance with sections 554 through 557 of title 5, United States Code [5 USCS §§ 554-557].

(C) Any charging letter or other document initiating administrative proceedings for the imposition of sanctions for violations of the regulations issued pursuant to section 8(a) of this Act [50 USCS Appx. § 2407(a)] shall be made available for public inspection and copying.

(3) An exception may not be made to any order issued under this Act which revokes the authority of a United States person to export goods or technology unless the Committee on Foreign Affairs of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate are first consulted concerning the exception.

(4) The President may by regulation provide standards for establishing levels of civil penalty provided in this subsection based upon the seriousness of the violation, the culpability of the violator, and the violator's record of cooperation with the Government in disclosing the violation.

(d) Payment of penalties. The payment of any penalty imposed pursuant to subsection (c) may be made a condition, for a period not exceeding one year after the imposition of such penalty, to the granting, restoration, or continuing validity of any export license, permission, or privilege granted or to be granted to the person upon whom such penalty is imposed. In addition, the payment of any penalty imposed under subsection (c) may be deferred or suspended in whole or in part for a period of time no longer than any probation period (which may exceed one year) that may be imposed upon such person. Such a deferral or suspension shall not operate as a bar to the collection of the penalty in the event that the conditions of the suspension, deferral, or probation are not fulfilled.

(e) Refunds. Any amount paid in satisfaction of any penalty imposed pursuant to subsection (c), or any amounts realized from the forfeiture of any property interest or proceeds pursuant to subsection (g), shall be covered into the Treasury as a miscellaneous receipt. The head of the department or agency concerned may, in his discretion, refund any such penalty, within 2 years after payment, on the ground of a material error of fact or law in the imposition of the penalty. Notwithstanding section 1346(a) of title 28, United States Code [28 USCS § 1346(a)], no action

for the refund of any such penalty imposed pursuant to subsection (c) may be maintained in any court.

(f) Actions for recovery of penalties. In the event of the failure of any person to pay a penalty imposed pursuant to subsection (c), a civil action for the recovery thereof may, in the discretion of the head of the department or agency concerned, be brought in the name of the United States. In any such action, the court shall determine de novo all issues necessary to the establishment of liability. Except as provided in this subsection and in subsection (d), no such liability shall be asserted, claimed, or recovered upon by the United States in any way unless it has previously been reduced to judgment.

(g) Forfeiture of property interest and proceeds.
 (1) Any person who is convicted under subsection (a) or (b) of a violation of an export control imposed under section 5 of this Act [50 USCS Appx § 2404] (or any regulation, order, or license issued with respect to such control) shall, in addition to any other penalty, forfeit to the United States--
 (A) any of that person's interest in, security of, claim against, or property or contractual rights of any kind in the goods or tangible items that were the subject of the violation;
 (B) any of that person's interest in, security of, claim against, or property or contractual rights of any kind in tangible property that was used in the export or attempt to export that was the subject of the violation; and
 (C) any of that person's property constituting, or derived from, any proceeds obtained directly or indirectly as a result of the violation.
 (2) The procedures in any forfeiture under this subsection, and the duties and authority of the courts of the United States and the Attorney General with respect to any forfeiture action under this subsection or with respect to any property that may be subject to forfeiture under this subsection, shall be governed by the provisions of section 1963 of title 18, United States Code [18 USCS § 1963].

(h) Prior convictions.
 (1) No person convicted of a violation of this Act (or any regulation, license, or order issued under this Act), any regulation, license, or order issued under the International Emergency Economic Powers Act [50 USCS §§ 1701 et seq.], section 793, 794, or 798 of title 18, United States Code [18 USCS §§ 793, 794, 798], section 4(b) of the Internal Security Act of 1950 (50 U.S.C. 783(b)) [50 USCS § 783(b)], or section 38 of the Arms Export Control Act (22 U.S.C. 2778) [22 USCS § 2778] shall be eligible, at the discretion of the Secretary, to apply for or use any export license under this Act for a period of up to 10 years from the date of the conviction. The Secretary may revoke any export license under this Act in which such person has an interest at the time of the conviction.
 (2) The Secretary may exercise the authority under paragraph (1) with respect to any person related, through affiliation, ownership, control, or position of responsibility, to any person convicted of any violation of law set forth in paragraph (1), upon a showing of such relationship with the convicted party, and subject to the procedures set forth in section 13(c) of this Act.

(i) Other authorities. Nothing in subsection (c), (d), (f), (g), or (h) limits--

(1) the availability of other administrative or judicial remedies with respect to violations of this Act, or any regulation, order, or license issued under this Act;

(2) the authority to compromise and settle administrative proceedings brought with respect to violations of this Act, or any regulation, order, or license issued under this Act; or

(3) the authority to compromise, remit or mitigate seizures and forfeitures pursuant to section 1(b) of title VI of the Act of June 15, 1917 (22 U.S.C. 401(b)) [22 USCS § 401(b)].

15 CFR 764.2

§ 764.2 Violations.

(a) Engaging in prohibited conduct. No person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by, the EAA, the EAR, or any order, license or authorization issued thereunder.

(b) Causing, aiding, or abetting a violation. No person may cause or aid, abet, counsel, command, induce, procure, or permit the doing of any act prohibited, or the omission of any act required, by the EAA, the EAR, or any order, license or authorization issued thereunder.

(c) Solicitation and attempt. No person may solicit or attempt a violation of the EAA, the EAR, or any order, license or authorization issued thereunder.

(d) Conspiracy. No person may conspire or act in concert with one or more persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of the EAA, the EAR, or any order, license or authorization issued thereunder.

(e) Acting with knowledge of a violation. No person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, in whole or in part, any item exported or to be exported from the United States, or that is otherwise subject to the EAR, with knowledge that a violation of the EAA, the EAR, or any order, license or authorization issued thereunder, has occurred, is about to occur, or is intended to occur in connection with the item.

(f) Possession with intent to export illegally. No person may possess any item controlled for national security or foreign policy reasons under sections 5 or 6 of the EAA:

(1) With intent to export or reexport such item in violation of the EAA, the EAR, or any order, license or authorization issued thereunder; or

(2) With knowledge or reason to believe that the item would be so exported or reexported.

(g) Misrepresentation and concealment of facts. (1) No person may make any false or misleading representation, statement, or certification, or falsify or conceal any material fact, either directly to BIS, the United States Customs Service, or an official of any other United States agency, or indirectly through any other person:

(i) In the course of an investigation or other action subject to the EAR; or

(ii) In connection with the preparation, submission, issuance, use, or maintenance of any export control document as defined in § 772.1, or any report filed or required to be filed pursuant to § 760.5 of the EAR; or

(iii) For the purpose of or in connection with effecting an export, reexport or other activity subject to the EAR.

(2) All representations, statements, and certifications made by any person are deemed to be continuing in effect. Every person who has made any representation, statement, or certification must notify BIS and any other relevant agency, in writing, of any change of any material fact or intention from that previously represented, stated, or certified, immediately upon receipt of any information that would lead a reasonably prudent person to know that a change of material fact or intention has occurred or may occur in the future.

(h) Evasion. No person may engage in any transaction or take any other action with intent to evade the provisions of the EAA, the EAR, or any order, license or authorization issued thereunder.

(i) Failure to comply with reporting, recordkeeping requirements. No person may fail or refuse to comply with any reporting or recordkeeping requirement of the EAR or of any order, license or authorization issued thereunder.

(j) License alteration. Except as specifically authorized in the EAR or in writing by BIS, no person may alter any license, authorization, export control document, or order issued under the EAR.

(k) Acting contrary to the terms of a denial order. No person may take any action that is prohibited by a denial order. See § 764.3(a)(2) of this part.